VOTO DISIDENTE DE LA
JUEZ PESANTE MARTÍNEZ
2005 DTA 80
San Juan, Puerto Rico, a 10 de mayo de 2005
Disiento de la decisión tomada por la mayoría del Panel. Con ella quedó atrás la norma de que todo reclamo de expectativa razonable de intimidad que se haga en nuestro país tiene que ser considerado teniendo en cuenta la factura ancha que provee nuestra Constitución en comparación con la Constitución Federal.
Con la presente decisión se avala y justifica que un contingente de policías federales y estatales, en horas de la madrugada y con una orden de arresto únicamente, irrumpan en un hogar, arresten al sospechoso y luego de ello procedan a registrar las habitaciones hasta encontrar un arma descargada debajo de una cama. No puedo suscribir la teoría de que es perfectamente razonable llevar a cabo un “rastreo rápido” del lugar en ocasión de diligenciar una orden de arresto. Así tampoco, que luego de diligenciar la misma, del arrestado estar esposado en la espalda y tirado en el piso, los agentes puedan buscar en el resto de la casa como medida de seguridad para cerciorarse que no haya otras personas que pudieran atentar contra su seguridad.
Se hace necesario citar in extenso la porción de la transcripción del contrainterrogatorio al que fue sometido el agente del F.B.I., John S. Morales López, relacionado el asunto que nos ocupa.
CONTRA INTERROGATORIO
LIC. COLON
DEFENSA: Don John, usted dice que trabaja como Agente especial para el FBI, y que en tal capacidad usted el 26'de febrero del 2004 fue a diligenciar una orden'de arresto.
TESTIGO: Es correcto.
DEFENSA: Esta orden de arresto iba dirigida a una persona que se llama Eddie Samir Rodríguez Berrios.
TESTIGO: Es correcto.
DEFENSA: Verdad que sí. No contaban ustedes con ninguna Orden de Registro.
TESTIGO: Es correcto.
DEFENSA: Verdad que no tenían ninguna.
TESTIGO: No.
DEFENSA: No. Oiga y usted dice que usted comparece a la residencia de Eddie Samir Berrios en horas de la *140 madrugada.
TESTIGO: Coixecto.
DEFENSA: ¿Qué hora era?
TESTIGO: Desconozco exactamente la hora.
DEFENSA: ¿Las tres de la mañana?
TESTIGO: Posible.
DEFENSA: Posiblemente.
DEFENSA: Y cuando llegan a las tres de la mañana a esa residencia, usted dice que identifican a viva voz como que son del Negociado de Investigaciones Especiales, digo del FBI.
TESTIGO: Correcto.
DEFENSA: Y dice que va acompañado de otros agentes del FBI.
TESTIGO: Correcto.
DEFENSA: ¿Verdad?
TESTIGO: Sí.
DEFENSA: ¿Qué por lo menos, cuántos agentes fueron juntos?
TESTIGO: Por lo menos tres.
DEFENSA: Por lo menos tres fueron. Y además fueron agentes de la Policía de Puerto Rico, cuatro agentes de operaciones tácticas, ¿verdad? De la Comandancia de Mayagüez.
TESTIGO: Correcto.
DEFENSA: Verdad que sí.
TESTIGO: ...
DEFENSA:El Sargento Digno Cartagena...ah?
TESTIGO: Aja.
DEFENSA: Usted y dos más. Cuatro, cinco, seis, siete, ocho, nueve personas por lo menos.
TESTIGO: Right.
DEFENSA: Verdad que sí, todos fueron armados.
*141 TESTIGO: Correcto.
DEFENSA: Los de operaciones tácticas con armas largas, ¿verdad? ¿llevaron armas largas?
TESTIGO: Ellos estaban armados con sus armas de reglamento.
DEFENSA: ¿Si llevaron armas largas, le pregunto?
TESTIGO: No estaba pendiente de eso.
DEFENSA: ¿Alguno de ustedes llevó armas largas allí?
TESTIGO: Sí.
DEFENSA: ¿Cuántas armas largas, señor?
TESTIGO: El número exacto no lo sé.
DEFENSA: Más o menos.
TESTIGO: Dos o Tres.
DEFENSA: Dos o tres. Y usted dice que habiéndose identificado a viva voz, procedieron a abrir la puerta.
TESTIGO: Se verificó la puerta.
DEFENSA: Y procedieron a abrirla.
TESTIGO: Es correcto.
DEFENSA: Y cuando la abren, se topan con que en el pasillo, hay un hombre totalmente desnudo, ¿verdad que sí?
TESTIGO: Correcto.
DEFENSA: Imposible que usted pensara que él tuviera un arma. Desnudo, con las manos arriba. Imposible que usted pensara que tuviera un arma.
TESTIGO: Eso es así.
DEFENSA: Y ustedes lo que procedieron a hacer fue a llamarlo a que viniera donde estaban ustedes.
TESTIGO: Conecto.
DEFENSA: Y en efecto caminó hacia donde estaban ustedes. Verdad.
TESTIGO: ...
DEFENSA: Verdad que sí. Y le pregunto señor, ¿si cuando caminó hacia donde estaban ustedes, lo arrestaron?
*142 TESTIGO: Es correcto.
DEFENSA: Y arrestarlo significa además esposarlo.
TESTIGO: Eso es correcto.
DEFENSA: Lo esposaron a la espalda. ¿Verdad?
TESTIGO: Sí.
DEFENSA: Lo tiraron al piso. Lo acostaron en el piso.
TESTIGO: Yo no lo acosté en el piso, por lo menos.
DEFENSA: ¿Lo vio acostado en el piso en algún momento?
TESTIGO: Luego de haber terminado el arresto, sí.
DEFENSA: O sea, cuando hacen el arresto, le ponen las esposas y lo acostaron en el piso.
TESTIGO: Si estaba acostado en el piso.
DEFENSA: Y usted dice que visualmente también ve dos mujeres.
TESTIGO: Una mujer y una niña.
DEFENSA: Mire, cuando usted entra a hacer ese arresto, usted no vio nada que no fuera un hombre parado con las manos arriba. ¿Verdad?
TESTIGO: Correcto.
DEFENSA: Usted no vio que ese hombre corriera, ¿verdad que no?
TESTIGO: Correcto.
DEFENSA: Verdad que no lo vio correr.
TESTIGO: No.
DEFENSA: Usted no vio que ese hombre tratara de ocultar nada, ¿verdad que no?
TESTIGO: No.
DEFENSA: Usted no vio que ese hombre le diera instrucciones a alguien para que ocultara nada.
TESTIGO: No.
DEFENSA: Es más, usted no vio a ese hombre ni hablar.
TESTIGO: Correcto.
*143 DEFENSA: Manos arriba, camine hacia al frente y caminó hacia el frente.
TESTIGO: Es correcto.
DEFENSA: Las otras dos personas que usted ve, no las ve corriendo. Verdad que no.
TESTIGO: Se estaban moviendo.
DEFENSA: Perdóname, pero no estaban corriendo, le pregunte.
TESTIGO: Negativo.
DEFENSA: No las vio ocultando nada. Verdad que no.
TESTIGO: No.
DEFENSA: Como cuestión de realidad, las ve también en ropa de dormir, ¿verdad?
TESTIGO: Es correcto.
DEFENSA: Que es una ropa que se ciñe bastante a la piel ¿verdad?
TESTIGO: Unabatita.
DEFENSA: O sea, que visualmente usted tampoco le veía nada que podría parecer un arma.
TESTIGO: Correcto.
DEFENSA: Y contra esas personas, usted no tiene nada, ninguna orden de arresto de registro, ni nada, ¿verdad que no?
TESTIGO: Correcto.
DEFENSA: Después que usted tiene a ese hombre allí acostado, en el piso y esposado, usted se metió al cuarto.
TESTIGO: No fue así, no fue así.
DEFENSA: Perdóneme.
TESTIGO: No fue así de esa manera. Esa no es la cronología de los acontecimientos.
DEFENSA: Ya no lo habían arrestado.
TESTIGO: Está arrestado, pero una vez yo lo tengo a él bajo arresto, se le da la custodia a los compañeros, yo procedo.
DEFENSA: Y después que está bajo la custodia, ¿de cuántos agentes, de cuantos? ¿ocho nueve?
TESTIGO: Aproximadamente.
*144 DEFENSA: Después de que está bajo la custodia de ocho o nueve agentes es que usted se mete al cuarto, ¿verdad.
TESTIGO: Sí.
DEFENSA: Y entre las cosas que hizo, buscó debajo de la cama, ¿verdad?
TESTIGO: Correcto.
DEFENSA: Y ahí es que encuentra el arma de fuego.
TESTIGO: Correcto.
DEFENSA: Un arma de fuego, que usted le dijo al juez que no estaba ni cargada...¿No estaba cargada, verdad que no?
TESTIGO: Negativo.
DEFENSA: Ni encontró ninguna munición en ningún sitio de la casa, ¿verdad que no?
TESTIGO: No se buscaron municiones.
DEFENSA: Perdóneme.
TESTIGO: No se registró la casa para buscar municiones.
DEFENSA: Mire a ver si en esta declaración jurada, usted dice que usted verificó el área a ver si habían municiones.
TESTIGO: Yo se lo que dice la declaración jurada.
DEFENSA: Mire a ver si en esta declaración jurada, usted dice que usted verificó el área a ver si habían municiones, es la pregunta.
TESTIGO: El área alrededor de la escopeta.
DEFENSA: Ahí dice que verificó el área para ver si había municiones.
TESTIGO: Sí.
DEFENSA: Y no dice el área alrededor de la escopeta, ¿verdad que no?
TESTIGO: No.
DEFENSA: Y que después de verificar el área para ver si habían municiones, no encontró ninguna ¿verdad?
TESTIGO: Correcto.
A la luz del testimonio del agente Morales López resulta poco menos que evidente que lo que hubo en el hogar de Rodríguez Berrios fue un registro no incidental a un arresto válido.
*145 En Pueblo v. Rosario Igartúa, 129 D.P.R. 1055, 1077-1079 (1992), el Tribunal Supremo expuso las normas aplicables al registro incidental al arresto y señaló lo siguiente:
“[Cjualquier registro que se realiza sin una orden judicial previa, goza de una presunción de invalidez sujeta sólo a ciertas limitaciones y excepciones. La carga probatoria de demostrar que el registro efectuado sin orden está justificado, la tiene el Ministerio Fiscal. Así, por ejemplo, el estado puede esbozar como justificación a. un registro sin orden que el mismo se efectuó incidental a un arresto legal cuando lo que se registra es el área bajo el control del arrestado, que el arrestado consintió al registro, que el objeto registrado estaba a plena vista o abandonado o que se trata de un registro de emergencia. A menos que no esté presente una de estas excepciones, una orden previa es necesaria para la realización del registro. ” (Énfasis nuestro y citas omitidas.)
En lo que respecta al registro incidental a un arresto, en Pueblo v. Sosa Díaz, 90 D.P.R. 622 (1964), se sentó el precedente que la regla que autoriza registros incidentales a un arresto legal, se justifica por la necesidad de ocupar armas u otros objetos que puedan utilizarse para escapar a la detención, así como por la necesidad de evitar la destrucción de evidencia relacionada con la comisión del delito. Sin embargo, Sosa también tuvo el ineludible efecto de ilustrarnos que dicha justificación queda sin efecto cuando el registro es remoto en tiempo y lugar del arresto. íd. Una vez el acusado ha sido arrestado y colocado bajo custodia, un registro hecho en otro lugar, sin una orden a esos efectos, sencillamente no es incidental al arresto. Pueblo v. Sosa Díaz, citando a Stoner v. California, 376 U.S. 483 (1964).
No estando presente las circunstancias reseñadas por el Tribunal Supremo que permiten realizar un registro incidental a un arresto, se debió denegar el auto de certiorari solicitado por la Oficina del Procurador General.
No albergamos dudas de la inaplicabilidad de Maryland v. Buie, 494 US 25(1990). Además de ser distinguible de la situación de hechos que presenta el caso de título, el Tribunal Supremo de Puerto Rico no ha adoptado lo allí resuelto. Lo anterior, pese a que ha tenido la oportunidad de hacerlo, y por el contrario, ha optado en reafirmar en numerosas ocasiones la norma de Sosa Díaz. Además, ¿podemos creer que el F.B.I. desconocía quiénes eran los moradores de la residencia?; si los agentes temían por su vida ¿cómo se explica que un sólo agente, de nueve o diez, acudiera solo a una habitación en busca de otras personas que pudieran atentar-contra su seguridad?; si ya descargaron su obligación de arrestar al sospechoso, y éste no constituía un peligro porque estaba esposado y tirado en el piso, ¿porqué continuaron registrando el hogar? Dadas las circunstancias particulares del presente caso ¿qué peligro representaba, una mujer y una niña soñolientas y en ropa de dormir, que se encontraban en el pasillo de una residencia, y de quien se tenía que presumir desconocían que esa madrugada se iba a diligenciar una orden de arresto? La contestación a éstas y otras interrogantes, me da el convencimiento intelectual y moral de que la incautación del arma de fuego en controversia fue producto de un registro ilegal.
Mi conciencia me impide validar una decisión amparada en la legalidad de un registro, por razón de que por ser en el hogar, éste revista un riesgo de peligro mayor que si hubiese sido un arresto en la calle.
Por las razones precedentemente expuestas, considero que actuó correctamente el TPI al suprimir la evidencia consistente en un arma de fuego descargada. Por ello disiento de la decisión del Panel.
HON. CARMEN ANA PESANTE MARTÍNEZ
Juez del Tribunal de Apelaciones